# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**DANYEL JOHNSON**
        **Plaintiff,**

   **v.**                                                       **Case No. 13-C-1023**

**CAROLYN W. COLVIN,**
**Acting Commissioner of the Social Security Administration**
        **Defendant.**

## DECISION AND ORDER

Plaintiff Danyel Johnson claims that she cannot work due to, inter alia, fibromyalgia and complex regional pain syndrome ("CRPS"). Because these conditions often produce pain and other symptoms out of proportion to the "objective" medical evidence, it is crucial that the disability adjudicator evaluate credibility with great care and a proper understanding of the diseases. See Sarchet v. Chater, 78 F.3d 305 (7th Cir.1996); SSR 03-2p, 02003 WL 22399117; see also Carradine v. Barnhart, 360 F.3d 751 (7th Cir. 2004). Because I conclude that the administrative law judge ("ALJ") erred in evaluating plaintiff's credibility and certain limitations endorsed by her doctors, I reverse the denial of her application for social security disability benefits and remand for further proceedings.

## I. BACKGROUND

Although plaintiff has suffered from fibromyalgia (and depression) for many years (Tr. at 602-03), her disability claim arises out of a July 2007 motor vehicle accident, in which she suffered fractures, lacerations, and other serious injuries (Tr. at 350-52, 445-50). She initially applied for social security benefits in August 2007 based on her depression, fibromyalgia, and

the injuries from the accident, but that application was eventually denied in April 2010. (Tr. at 73-81.) She filed the instant application, which alleges a disability onset of April 29, 2010 (the date of the previous denial), in June 2010,[1] asserting, in addition to the previous conditions, CRPS, with worsening pain and fatigue. (Tr. at 240-41, 253, 308-14.) She supported her application with reports from her primary care physician, Dr. Kleczka, and her treating neurologist, Dr. Barboi, both of whom opined that she lacked the capacity to sustain full-time work.[2] (Tr. at 587-91, 639-43.) At her hearing before the ALJ, plaintiff explained that she could no longer work due to chronic daily pain, fatigue, depression, panic attacks, inability to focus, and nervousness around others. (Tr. at 131, 150.)

The ALJ found that plaintiff suffered from the severe impairments of fibromyalgia, autonomic dysfunction disorder, history of right tibia fracture and pelvic injury, depression, and anxiety (Tr. at 26), but that she retained the residual functional capacity ("RFC") to perform a range of unskilled, low stress, sedentary work. (Tr. at 28.) In making this finding, the ALJ rejected plaintiff's testimony and her doctors' reports asserting greater limitations, instead

---

[1]She does not seek to re-open the previous application, and the propriety of its denial is not before me.

[2]The medical records indicate that by January 2008 plaintiff's leg fracture had healed, and she was released to "sitting work with limited amounts of walking." (Tr. at 439.) However, a January 22, 2008, pelvic CT scan revealed extensive erosive changes indicative of inflammatory arthritis. (Tr. at 363, 451-52). Plaintiff returned to her orthopedist on February 5, 2008, complaining of anterior pelvic pain and ambulating with a cane. The doctor put her physical therapy on hold until they figured out what was going on with her pelvis. (Tr. at 437.) However, plaintiff received no further medical treatment until February 2010, when she saw Dr. Barboi for a neurological consult. Dr. Barboi suspected a background autonomic dysfunction syndrome and noted elements of complex regional pain syndrome in her right leg and pelvic region. Dr. Barboi concluded that this offered insight into why plaintiff's recovery from the accident had been delayed; he suspected that she could remain symptomatic for years. (Tr. at 636.) Subsequent autonomic testing confirmed the dysfunction. (Tr. at 638; see also 523-24.)

2

giving "significant weight" to opinions from non-examining consultants finding plaintiff capable of unskilled sedentary work with moderate pace and social restrictions. (Tr. at 28-32.) Based on this RFC, and relying on the testimony of a vocational expert, the ALJ concluded that plaintiff could perform jobs existing in significant numbers in the economy. (Tr. at 32-33.)

When the Appeals Council denied plaintiff's request for review, the ALJ's decision became the final decision of the Commissioner on plaintiff's application. See Moore v. Colvin, 743 F.3d 1118, 1120 (7th Cir. 2014). Plaintiff seeks judicial review of that decision.

## II. DISCUSSION

**A.    Standard of Review**

The court will uphold an ALJ's decision so long as he applied the correct legal standards and supported his decision with "substantial evidence." Bates v. Colvin, 736 F.3d 1093, 1097 (7th Cir. 2013). Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971). Under this deferential standard, the reviewing court may not re-weigh the evidence or substitute its judgment for that of the ALJ. Moore, 743 F.3d at 1121. Nevertheless, the court must conduct a critical review of the evidence, ensuring that the ALJ adequately discussed the issues and built an accurate and logical bridge from the evidence to his conclusion. McKinzey v. Astrue, 641 F.3d 884, 889 (7th Cir. 2011). The court must also review for compliance with the Commissioner's Social Security Rulings, which are "binding on all components of the Social Security Administration." 20 C.F.R. § 402.35(b)(1); see also Prince v. Sullivan, 933 F.2d 598, 602 (7th Cir. 1991).

3

**B.     Plaintiff's Impairments**

As indicated, plaintiff alleges disability based primarily on her CRPS and fibromyalgia. CRPS is a unique clinical syndrome that may develop following trauma, characterized by complaints of intense pain typically out of proportion to the severity of the precipitant and usually including signs of autonomic dysfunction.[3]  Social Security Ruling ("SSR") 03-2p, 2003 WL 22814447, at *1.  Recognizing the difficulties associated with adjudicating disability claims based on CRPS, the Commissioner has set forth guidelines for ALJs to follow.  SSR 03-2p, 2003 WL 22814447.  Under this Ruling, CRPS can be established based on persistent complaints of pain and one or more documented signs in the affected region (e.g., swelling, autonomic instability, or osteoporosis).  Id. at *4.  The Ruling cautions that these signs may be present at one examination and not appear at another; such transient findings are characteristic of CRPS and thus do not affect a finding that a medically determinable impairment is present.  Id.   Nor is it unusual for the medical record to contain conflicting evidence in cases of CRPS due to the transitory nature of its objective findings and the complicated diagnostic process involved.  Id. at *5.

Once the disorder has been established as a medically determinable impairment, the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit her ability to work.  If the claimant's statements are

---

[3]The autonomic nervous system is that part of the nervous system which controls involuntary actions, such as blood pressure, heart rate, sweating, and digestion. http://www.healthline.com/health/autonomic-dysfunction#Overview. Autonomic nervous system disorders can affect either part of the system, as in CRPS, or all of the system.  Some autonomic nervous system disorders get better when an underlying disease is treated.  Often, however, there is no cure, in which case the goal of treatment is to improve symptoms. http://www.nlm.nih.gov/medlineplus/autonomicnervoussystemdisorders.html.

4

not substantiated by objective medical evidence (as will likely often be the case with CRPS), the ALJ must make a finding on the credibility of the claimant's statements based on the entire case record. Id. at *6 (citing SSR 96-7p). Such statements "may not be disregarded solely because they are not substantiated by objective medical evidence." SSR 96-7p, 1996 WL 374186, at *1. SSR 03-2p further notes that the chronic pain associated with CRPS – and many of the medications prescribed to treat it – may affect the claimant's ability to maintain attention and concentration, as well as adversely affect her cognition, mood, and behavior. These factors can interfere with the claimant's ability to sustain work activity over time or preclude sustained work activity altogether. The effects of chronic pain and the use of pain medications therefore "must be carefully considered." 2003 WL 22814447, at *5; see also id. at *7 ("Careful consideration must be given to the effects of pain and its treatment on an individual's capacity to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis."). The ALJ must also carefully consider opinions from the claimant's medical sources, especially treating sources, concerning the effects of CRPS on the claimant's ability to function in a sustained manner in performing work activities. Id. at *7.

Many of these same issues arise in the evaluation of fibromyalgia, an "elusive and mysterious disease," because its:

> cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective. There are no laboratory tests for the presence or severity of fibromyalgia. The principal symptoms are "pain all over," fatigue, disturbed sleep, stiffness, and – the only symptom that discriminates between it and other diseases of a rheumatic character – multiple tender spots, more precisely 18 fixed locations on the body (and the rule of thumb is that the patient must have at least 11 of them to be diagnosed as having fibromyalgia) that when pressed firmly cause the patient to flinch.

5

Sarchet, 78 F.3d at 306. Shortly after the ALJ decided this case, the Commissioner issued guidance for evaluating fibromyalgia claims, which similarly admonishes adjudicators to be aware of the fluctuating nature of symptoms, which will produce good and bad days, the need to evaluate credibility with care, and the importance of considering longitudinal records reflecting ongoing medical evaluation and treatment from medical sources. SSR 12-2p, 2012 WL 3104869.[4]

**C.      Plaintiff's Claims of Error**

**1.      Credibility**

The court ordinarily gives give special deference to an ALJ's credibility determination, reversing only if it is patently wrong. E.g., Schomas v. Colvin, 732 F.3d 702, 708 (7th Cir. 2013). However, if the determination rests on objective factors or fundamental implausibilities rather than subjective considerations like demeanor, the court has greater freedom in reviewing the decision. Id. Nor need the court defer to a credibility determination resting on errors of fact or logic. Allord v. Barnhart, 455 F.3d 818, 821 (7th Cir. 2006). Finally, in evaluating credibility the ALJ must follow SSR 96-7p, including that Ruling's admonition that "the ALJ may not discredit a claimant's testimony about her pain and limitations solely because there is no objective medical evidence supporting it." Villano v. Astrue, 556 F.3d 558, 562 (7th Cir. 2009).

In the present case, the ALJ started his credibility assessment with the customary boilerplate:

After careful consideration of the evidence, the undersigned finds that the

---

[4]Because SSR 12-2p post-dates the ALJ's decision, I do not rely on that Ruling to reverse. In any event, the Ruling appears to be clarifying rather than substantive, see Klyse v. Colvin, No. 12-15660, 2014 WL 689826 (9th Cir. Feb. 24, 2014), and the ALJ should on remand consider the guidance it provides.

6

claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible to the extent they are inconsistent with the above residual functional capacity assessment.

(Tr. at 29.) The Seventh Circuit has repeatedly condemned this language, e.g., Moore, 743 F.3d at 1122, a "template" drafted by the SSA for insertion into any ALJ's opinion to which it pertains, Bjornson v. Astrue, 671 F.3d 640, 644-45 (7th Cir. 2012). Most significantly, the template gets things backwards. As discussed above, in determining RFC, the ALJ must give careful consideration to the effects of pain and its treatment on the claimant's capacity to perform sustained work-related physical and mental activities. SSR 03-2p, 2003 WL 22399117, at *7. Yet the template purports to determine RFC first and then match the claimant's statement against that determination, effectively "forcing the testimony into a foregone conclusion." Filus v. Astrue, 694 F.3d 863, 868 (7th Cir. 2012). Further, noting that a claimant's statements "are not entirely credible" provides no clue to what weight the ALJ gave the testimony. Bjornson, 671 F.3d at 645.

However, use of the template does not automatically discredit the ALJ's ultimate conclusion if he otherwise provides reasons justifying it. Moore, 743 F.3d at 1122. Here, the ALJ provided eight more specific reasons for discrediting plaintiff's claims. Most of them, however, rest on an incomplete reading of the record and/or a misunderstanding of plaintiff's conditions.

**First**, the ALJ noted that, at the hearing, plaintiff reported looking for sit-down clerical or customer service work (as opposed to her past work requiring heavier lifting), which suggested plaintiff felt well enough to perform a sedentary job (if she could find one). (Tr. at 29, 130-31.) While efforts to work are relevant in evaluating credibility, see 20 C.F.R. §

404.1529(a), the ALJ overlooked that plaintiff was <u>required</u> to engage in job search activities through her participation in the "W2" welfare program. Moreover, plaintiff testified that she found the work search requirement "overwhelming," so she talked to her doctor, who reduced her program hours so that she would just do the "work experience" (i.e., training) portion of the program. (Tr. at 144-45, 607, 611-12.) Finally, the record indicates that plaintiff was subsequently sanctioned for failing to complete the work experience. (Tr. at 334-35.)

**Second**, the ALJ concluded that plaintiff's daily activities were not limited to the extent one would expect given her complaints of disabling symptoms. He pointed to her ability to care for her young children with no significant support outside the household, her participation in the W2 work program, her church attendance every weekend, and her ability to cook, drive, shop, and complete her own personal care. (Tr. at 29.) Again, while an ALJ may consider a claimant's daily activities when evaluating credibility, SSR 96-7p, 1996 WL 374186, at *3, he must do so "with care." <u>Roddy v. Astrue</u>, 705 F.3d 631, 639 (7th Cir. 2013). This is so because a person's ability to perform such tasks – especially if they can be done only with limitations or assistance from others – does not necessarily translate into an ability to work full-time. <u>Id.</u>; <u>Gentle v. Barnhart</u>, 430 F.3d 865, 867-68 (7th Cir. 2005).

In the present case, while plaintiff did not receive <u>outside</u> help in caring for her children, she did receive significant assistance <u>inside</u> the home from her seventeen-year-old son in caring for her two younger children, as the ALJ himself recognized. (Tr. at 29.) It is no answer to say, as the ALJ did (Tr. at 29), that this assistance should be disregarded just because the oldest son also helped out before plaintiff stopped working.[5] As indicated above, plaintiff was

---

[5] In her disability report, plaintiff wrote that her kids were "old enough to help themselves." (Tr. at 308.) She just made sure they did what they were supposed to do. By

8

required to participate in the W2 work experience in order to receive benefits, and the evidence suggests that she was unable to fulfill even the modest requirements of that program.[6] Finally, the ALJ overlooked plaintiff's reported limitations in the other activities listed. For instance, plaintiff reported that her oldest son helped prepare meals; she used the microwave when she cooked. (Tr. at 310.) Plaintiff further reported that she could drive a car but did not do so often (Tr. at 313); she shopped with assistance (Tr. at 152-53, 313); and it took her longer to complete personal care tasks due to pain and fatigue (Tr. at 309). Nor did the ALJ explain how these rather modest activities undercut any of plaintiff's specific claims regarding her limitations. See, e.g., Shafer v. Colvin, No. 13-C-0929, 2014 WL 1785343, at *11 (E.D. Wis. May 5, 2014) (reversing credibility determination where the ALJ simply provided a list of activities, without linking them to any of the claimant's alleged restrictions and without considering his reported limitations in performing the activities); Mason v. Barnhart, 325 F. Supp. 2d 885, 903-04 (E.D. Wis. 2004) (reversing credibility determination based on the claimant's performance of minimal activities such as occasional driving, shopping, cooking simple meals, and church attendance).

**Third**, the ALJ indicated that plaintiff's failure to pursue treatment recommendations suggested that her symptoms were not as serious as alleged. The ALJ noted that plaintiff sought almost no treatment for two years before the disability onset date, and that her treatment since then was infrequent until the end of 2011. The ALJ further noted that it was recommended plaintiff pursue physical therapy, medication, and pain psychology, but she

---

the time of the hearing, the oldest son had apparently gone off to college, and plaintiff testified that the younger children (ages thirteen and seven – Tr. at 128) now helped her a lot. (Tr. at 152.)

[6]Plaintiff testified that she was required to attended four hours of training two days per week. (Tr. at 141.)

9

attended just one therapy session, did not pick up a prescription, and never scheduled a pain psychology appointment. (Tr. at 29.) Limited treatment is also a factor the ALJ can consider in evaluating credibility. SSR 96-7p, 1996 WL 374186, at *7. However, the ALJ "must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment." Id.; Roddy, 705 F.3d at 638. The ALJ may need to question the claimant at the hearing in order to determine whether there are good reasons the claimant does not seek medical treatment or does not pursue treatment in a consistent manner. SSR 96-7p, 1996 WL 374186, at *7 For instance, the claimant may structure her activities so as to minimize her symptoms, seeing a doctor only as needed for periodic evaluation and renewal of medications; the claimant may decline to take prescription medication because the side effects are less tolerable than the symptoms; she may be unable to afford treatment and may not have access to free or low-cost medical services; or she may have been advised by a medical source that there is no further, effective treatment that would help. Id. at *8.

In the present case, the record contains multiple notations that prescribed treatments, including physical therapy, failed to alleviate plaintiff's symptoms (Tr. at 592, 601, 616, 617-18, 631), and that prescribed medications caused intolerable side effects (Tr. at 529, 596, 597, 598, 609, 616). At the hearing, plaintiff testified that she had been discharged from treatment several times because the provider could not help her. (Tr. at 145.)

The Commissioner argues that the ALJ's failure to consider this evidence was harmless, since there is no reason to believe it would produce a different result on remand, given

10

plaintiff's inability to rebut the ALJ's specific findings. See Schomas, 732 F.3d at 707 (explaining that an error is harmless if the court "can predict with great confidence that the result on remand would be the same"). The evidence is not so clear cut.

The ALJ relied on a December 27, 2011, note from Dr. Kleczka (Tr. at 29, citing Ex. B15/10-15; Tr. at 601-06), in which plaintiff admitted that she attended just one therapy session for her fibromyalgia. However, plaintiff also explained that "the TENS unit aggravated" her condition. (Tr. at 601.) Dr. Kleczka encouraged plaintiff to see PT for additional sessions (Tr. at 606), and when plaintiff saw another provider on January 20, 2012, she indicated that she was working with PT but was too sick and fatigued to do so consistently. She further indicated that she was performing the stretches given to her by PT but not the aerobic exercise. (Tr. at 621.)

During the December 27, 2011 visit, Dr. Kleczka also noted that plaintiff did not pick up a prescription for Clonazepam prescribed by a nurse practitioner from the neurology clinic, Mary Yellick. (Tr. at 601). However, plaintiff denied having that prescription (Tr. at 601), and at the conclusion of the note Dr. Kleczka stated: "uncertain if she [Yellick] still wanted her to take this?" (Tr. at 606.) On January 20, 2012, Clonazepam was listed among plaintiff's current prescriptions (Tr. at 622), and at the hearing plaintiff testified that she recently started taking Clonazepam (Tr. at 139-40). In sum, it is unclear whether plaintiff even knew on December 27, 2011, that this prescription had been made, and it appears that she received it thereafter. The ALJ cited no other instances of failure to pick up prescriptions, and the record shows that plaintiff tried numerous different pills to try to alleviate her symptoms (as will be discussed below).

This leaves plaintiff's failure to follow up with pain psychology, which Yellick

11

recommended. (Tr. at 594, 601.) At the hearing, plaintiff testified:

> I'm still waiting for them to set up an appointment with me. I was told that the doctor had to go over my file, and once they go over the file, then I should get a phone call. And it's been a couple of months now. And I told the last therapist about that. But she – he even mentioned that, and I explained to her that I haven't had a phone call yet about setting up an appointment for that, yeah.

(Tr. at 149.) The ALJ need not accept this explanation, but he must consider it.

**Fourth**, the ALJ noted that when plaintiff did seek treatment, her doctors recommended that she exercise more to increase her endurance. From this, the ALJ drew the inference that plaintiff's subjective symptoms and limitations may be due to de-conditioning rather than her medically determinable impairments. However, the ALJ failed to appreciate that exercise is customarily suggested treatment for fibromyalgia. See, e.g., Johnson v. Astrue, 597 F.3d 409, 412 (1st Cir. 2009); Dominguese v. Massanari, 172 F. Supp. 2d 1087, 1096 (E.D. Wis. 2001) (citing Mark H. Beers, M.D. and Robert Berkow, M.D., The Merck Manual of Diagnosis and Therapy (17th ed.1999)). Further, Dr. Barboi, plaintiff's neurologist, opined that further escalation of analgesics would not help plaintiff, instead recommending increased function and mobility. (Tr. at 636.)

The ALJ looked for support to Dr. Polczinski, the SSA's psychological consultant, who questioned whether plaintiff was "deconditioned to some extent." (Tr. at 30, 469.) However, Dr. Polczinski, ostensibly recognizing the limits of his expertise, immediately followed with: "This is deferred to medical report." (Tr. at 469.) Nor do the treatment notes cited by the ALJ provide much support. The reference to "regular exercise to increase endurance" (Tr. at 521) set forth in the exhibit cited by the ALJ (Tr. at 30, citing ex. 13F) referred to treatment for palpitations, and the November 21, 2011 note stating "suspect muscular origin" specifically referred to plaintiff's flank pain. (Tr. at 611.)

12

**Fifth**, the ALJ stated that plaintiff's current claim of continuous, totally disabling pain was inconsistent with a February 2010 note in which she described her symptoms as "intermittent" and lasting only a few days when they occur. (Tr. at 30, 631.) The ALJ offered no citation for the notion that plaintiff currently alleged constant, disabling pain. At the hearing, plaintiff said she had "chronic pain where I'm hurting every day." (Tr. at 131.) She also said she had good and bad days. (Tr. at 135.) In any event, on closer inspection of the February 2010 note I find no substantial inconsistency. When plaintiff saw Dr. Barboi at that time, several months before the alleged onset date, she related her diagnosis of fibromyalgia, "manifested mainly as chronic pain." (Tr. at 631.) She described her more recent pain in the pelvic region and right lower extremity as "intermittent."[7] (Tr. at 631.) That one type of pain (related to CPRS) was intermittent, the other (related to fibromyalgia) chronic, does not make plaintiff incredible. Indeed, this appears to be consistent with the way these diseases generally manifest. SSR 12-2p, 2012 WL 3104869, at *2; SSR 03-2p, 2003 WL 22399117, at *4-5. It is also worth noting that the ALJ selectively read this treatment note in stating that the symptoms "last[] only a few days when they do occur." (Tr. at 30.) The note actually states: "These occur intermittently, last a few days at a time, and are quite disabling and do not respond to ongoing medications." (Tr. at 631.) An ALJ may not cherry-pick statements from the record, which appear to support his decision, without consideration of the context in which they appear. Bates, 736 F.3d at 1099.

The ALJ also noted that at one point plaintiff told her doctor that she received some relief from non-narcotic medications (ibuprofen and Tramadol), which the ALJ believed were not the

---

[7]Dr. Barboi diagnosed CRPS in the right lower extremity and pelvis. (Tr. at 636.)

13

type of medication one would expect if plaintiff's pain were truly disabling. (Tr. at 30, 613.) The ALJ cited no medical evidence regarding the type of medications a person with plaintiff's conditions would be expected to take. While narcotics may be used to treat CRPS, SSR 03-2p, 2003 WL 22399117, at *3, it appears that such drugs are not generally recommended to treat fibromyalgia, see, e.g., Schlote v. Astrue, No. 1:11-cv-01735, 2012 WL 1965765, at *7 (N.D. Ohio May 31, 2012). In any event, the ALJ overlooked evidence that plaintiff was allergic to the narcotics Oxycontin and Methadone (Tr. at 603, 609), and that Dr. Barboi recommended against "escalation of analgesics" (Tr. at 636). Nor did the ALJ address plaintiff's use of numerous other medications, including muscle relaxers (e.g., Cyclobenzaprine),[8] anti-epileptic drugs (e.g., Clonazepam, Gabapentin);[9] and anti-depressants (e.g., Effexor, Savela)[10] (Tr. at 596, 600, 616, 622), which are commonly used to treat CRPS. SSR 03-2p, 2003 WL 22399117, at *3.

**Sixth**, the ALJ stated that treatment records documented presentation and exam findings not necessarily consistent with plaintiff's reported problems. Specifically, the ALJ noted that in October 2011 plaintiff reported being "out" for a week due to her symptoms, yet she appeared in no apparent distress, displayed negative straight leg raise and had normal reflexes, strength, and sensation, which suggested no significant problems regarding her alleged hand cramps, muscle aches and spasms, and fatigue. (Tr. at 30, 616-18.) On January 20, 2012, plaintiff reported being too sick and fatigued to pursue therapy, but physical exam

---

[8]http://www.drugs.com/cyclobenzaprine.html.

[9] http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682279.html; http://www.nlm.nih.gov/medlineplus/druginfo/meds/a694007.html.

[10]http://www.drugs.com/effexor.html; http://www.rxlist.com/savella-drug.htm.

14

revealed nothing acutely abnormal and hip x-rays were normal. (Tr. at 30, 621-23.) Again, while the ALJ may consider the objective medical evidence in evaluating credibility, once a severe impairment had been established that could produce the symptoms alleged, the claimant's statements about symptom intensity cannot be "disregarded solely because they are not substantiated by objective medical evidence." SSR 96-7p, 1996 WL 374186, at *6. Further, the ALJ must ensure that the "objective" evidence he considers is pertinent to the claimant's impairments. See, e.g., Sarchet, 78 F.3d at 307 ("Since swelling of the joints is not a symptom of fibromyalgia, its absence is no more indicative that the patient's fibromyalgia is not disabling than the absence of headache is an indication that a patient's prostate cancer is not advanced."). For instance, the ALJ relied on negative straight leg raise, but that test is used to determine whether a patient with low back pain has an underlying herniated disk, e.g., Allen v. Colvin, 942 F. Supp. 2d 814, 819 n.5 (N.D. Ill. 2013), something plaintiff has never alleged. The ALJ cited normal hip x-rays, but such a test would not refute pain and fatigue caused by fibromyalgia. See, e.g., Holloway v. Astrue, No. 12-178, 2012 WL 4815664, at *7 (S.D. Ill. Oct. 10, 2012) (citing Sarchet, 78 F.3d at 306). The ALJ found a severe autonomic dysfunction disorder, but did not specifically discuss CRPS (a type of autonomic disorder) or consider the criteria set forth in SSR 03-2p.

**Seventh**, the ALJ noted that plaintiff was diagnosed with fibromyalgia and mental illnesses in 2000 and 2005, respectively, before she stopped working. (Tr. at 30.) However, the ALJ did not explain how this undercut plaintiff's credibility. As the ALJ himself recognized, plaintiff stopped working after her accident in 2007, and she was diagnosed with autonomic disorder in early 2010, shortly before the alleged disability onset date. (Tr. at 30.) Even if plaintiff's fibromyalgia and depression were not themselves disabling, the ALJ was required to

15

consider the <u>combined</u> effects of all of plaintiff's impairments.  E.g., Terry v. Astrue, 580 F.3d 471, 477 (7th Cir. 2009).

**Eighth**, the ALJ noted that plaintiff had not pursued treatment for her mental impairments since the alleged onset date; that the mental status examinations did not show any particular limitations in memory, relations, or cognition; and that her description of symptoms to the examiners was vague and general.  (Tr. at 30-31.)  At the hearing, plaintiff testified that she tried psychotherapy for her depression in the past but was discharged for missing too many days due to pain.  She further testified that she did not find it helpful.  (Tr. at 146.)  She took Effexor after the alleged onset date, but that was discontinued due to side effects.  (Tr. at 598.)  As indicated above, limited treatment is something the ALJ can consider, but he must also consider any reasons why the claimant failed to pursue regular treatment.  He must also consider mental limitations arising out of plaintiff's physical conditions.  See SSR 03-2p, 2003 WL 2239917, at *5.

In sum, while the ALJ provided specific reasons for discounting plaintiff's credibility, they rested on an incomplete reading of the record and misunderstanding of plaintiff's diseases.  The matter must be remanded for reconsideration.

### 2. Treating Source Statements

An ALJ must give "controlling weight" to a treating source's opinion if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence.  Punzio v. Astrue, 630 F.3d 704, 710 (7th Cir. 2011).  If the ALJ finds that the opinion does not merit controlling weight, he must determine what value the assessment does deserve, considering a checklist of factors including the length, nature, and

16

extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion. Scott v. Astrue, 647 F.3d 734, 740 (7th Cir. 2011); Bauer v. Astrue, 532 F.3d 606, 608 (7th Cir. 2008). Whenever an ALJ discounts a treating source's opinion, he must provide "good reasons." Scott, 647 F.3d at 739.

The ALJ's evaluation of the treating source opinions in this case suffers from many of the same flaws as his discussion of plaintiff's credibility. The ALJ gave "some weight" to Dr. Kleczka's report, but discounted her opinion regarding frequent absences and inability to work a full day. The ALJ relied on Dr. Kleczka's purported comment that plaintiff's limitations were muscular (conditioning) rather than due to her medically determinable impairments, the absence of medical evidence of acute abnormalities that would correspond to flare-ups causing plaintiff to miss work, and the lack of support in the treatment records or plaintiff's reported activities. (Tr. at 31.)

Dr. Kleczka never said that plaintiff's problems were due to de-conditioning rather than her impairments. The ALJ did not provide a record citation, but it appears he was referring to Dr. Kleczka's November 21, 2011, treatment note in which the doctor said, in reference to plaintiff's flank pain, "suspect muscular origin." (Tr. at 611.) In her report, Dr. Kleczka attributed plaintiff's work-related limitations to fibromyalgia and autonomic disorder. As indicated above, both conditions defy traditional diagnostic methods, and both can cause good and bad days, which the ALJ failed to appreciate. The ALJ apparently found a conflict between Dr. Kleczka's finding that plaintiff could sit for six hours and stand/walk for two in an eight hour day (Tr. at 588) and her conclusion that plaintiff could participate in work or work readiness activities just two hours per day (Tr. at 590). But the ALJ overlooked Dr. Kleczka's explanation

17

that, based on all of her limitations, plaintiff required the accommodation of a flexible, part-time schedule to help her function effectively in a work-education environment. (Tr. at 590.) There is more to work than sitting and standing. Finally, the ALJ's reliance on plaintiff's modest daily activities fairs no better as reason to reject Dr. Kleczka's report than it did to discount plaintiff's credibility, for the reasons stated above.

The ALJ also gave "some weight" to Dr. Barboi's report, discounting the findings that plaintiff needed to elevate her legs, required unscheduled breaks, and would be absent more the four days per month. The ALJ noted that Dr. Barboi had not "tested" plaintiff's functional abilities and found that the above limitations were not fully consistent with plaintiff's daily activities, limited use of medication, and failure to pursue recommended therapy. The ALJ also noted that the record failed to document persistent swelling requiring elevation of the legs. (Tr. at 31.) The ALJ concluded that the suggestion that plaintiff could not sustain full-time work was not supported by the type of treatment provided by Dr. Barboi, plaintiff's pursuit of treatment, and her daily activities. (Tr at 31-32.)

Of course, the non-examining state agency consultant whose opinion the ALJ gave significant weight (Tr. at 31) hadn't tested plaintiff either.[11] Although swelling is a possible symptom of CRPS, Dr. Barboi did not say that swelling required leg elevation, so the absence of that symptom may not undercut the report. Finally, as discussed more fully above, the ALJ failed to explain how plaintiff's daily activities are inconsistent with disability, failed to consider

---

[11]The consultant opined that plaintiff's allegations "are quite out of proportion to the objective findings." (Tr. at 494.) However, it appears that the consultant considered only plaintiff's obesity and history of fractures (Tr. at 489), not her CRPS, which typically causes pain "out of proportion to the severity of the injury sustained by the individual." SSR 03-2p, 2003 WL 22399117, at *1. The ALJ must on remand consider SSR 03-2p in deciding the weight to accord the consultant's opinion.

18

plaintiff's explanations for her sporadic treatment, and failed to appreciate the good and bad days that typically accompany fibromyalgia and CRPS. The matter must be remanded for reconsideration of the treating source opinions.

### III.  CONCLUSION

For the reasons stated herein, the matter must be remanded for reconsideration of plaintiff's credibility and the treating source opinions. The ALJ must then redetermine RFC, considering all of plaintiff's impairments, severe and non-severe, and the limitations arising therefrom, under SSR 96-8p.[12]

**THEREFORE, IT IS ORDERED** that the ALJ's decision is reversed, and this matter is remanded to the Commissioner for further proceedings consistent with this decision. The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 18th day of June, 2014.

/s Lynn Adelman

_____
LYNN ADELMAN
District Judge

---

[12] Plaintiff also argues that the ALJ failed to consider CRPS under the Listings and did not account for the moderate limitations included in the state agency consultant's mental RFC report. Plaintiff makes no attempt to show medical equivalence, see SSR 03-2p, 2003 WL 22399117, at *6, so the step three error could be harmless. See Shafer, 2014 WL 1785343, at *15 n.25; Hovi v. Colvin, No. 12-C-169, 2013 WL 3989232, at *16 (W.D. Wis. Aug. 2, 2013), and the ALJ arguably employed adequate "alternative phrasing," O'Connor-Spinner v. Astrue, 627 F.3d 614, 619 (7th Cir. 2010), in setting RFC and questioning the vocational expert. (Tr. at 28; 160-61). Cf. Felmey v. Colvin, No. 13-C-219, 2013 WL 4502090, at *18 (E.D. Wis. Aug. 22, 2013); Zoephel v. Astrue, No. 12-C-726, 2013 WL 412608, at *11 (E.D. Wis. Feb. 1, 2013); Reed v. Astrue, No. 10 C 0001, 2011 WL 3895302, at *13 (N.D. Ill. Aug. 31, 2011). Because the case must be remanded for the reasons set forth in the text, I need not decide these issues; plaintiff will be free to press them on remand.

19